# FEBRUARY, 1930

R. H. GOLLNICK v. W. S. FRY AND JOHN E. QUARLES.

No. 5365. Decided February 5, 1930.
(23 S. W., 2d Series, 677.)

*Clay Cooke,* for appellant.

The issues raised in this case are identical with those raised in the Kirby Lumber Company v. R. L. Lumber Co., 279 S. W., 546.

To our mind if the evidence does not conclusively show an assumption by the Quarles Lumber Company of the obligations of Fry, it certainly raises an issue of fact which plaintiff is entitled to have submitted to the jury.

*Charles Kassel* and *H. C. Ray,* for appellees.

A note given by a property owner to a contractor with a mechanic's lien contract to secure him in the erection of a building is commercial paper which the contractor could sell to any one who desired to buy it, and such purchaser assumes no liability with reference to the transaction, except to pay the contractor the consideration agreed upon. Corpus Juris, Vol. 5, p. 927; Galbraith-Foxworth Lumber Co. v. Long, 5 S. W., (2d) 163.

It appears that, by the admission of the plaintiff himself on the witness stand, he did not construe the statement of Quarles that he was financing the job to mean that he was to take care of any loss above the contract price.

Mr. Judge LEDDY delivered the opinion of the Commission of Appeals, Section B.

Certified questions from the Court of Civil Appeals for the Second District are as follows:

"This cause was before us on original hearing, the trial court having given a peremptory instruction in favor of the defendant John E. Quarles Company, as against plaintiff Gollnick's claims and against the defendant W. S. Fry in favor of plaintiff. From a judgment in accordance with the court's instructions, the plaintiff has appealed to this court.

"Appellant urged before this court that the evidence below established, or at least tended to establish, the issues of fact upon which plaintiff's cause of action was predicated, towit: (1) That Fry and the John E. Quarles Company jointly undertook the construction of this house for their joint profit; (2) that the John E. Quarles Company undertook the burden as well as the benefits of the Smith contract and was under an implied obligation to construct the building, if not an express obligation, and as such the plumbing put in there by the plaintiff was furnished for the use and benefit of the John E. Quarles Company; (3) that the John E. Quarles Company agreed with plaintiff to pay him for this work, expressly or impliedly; (4) that Fry was the agent for the John E. Quarles Company in accepting plaintiff's bid and acted for it; (5) that the John E. Quarles Company obtained plaintiff's work and material for its benefit by fraud and deceit.

"On original consideration, we concluded that from the evidence introduced the trial court erred in giving a peremptory instruction for John E. Quarles Company and in entering judgment for said company, and that the question of the liability of the lumber company should have been left to the jury, as will be noted from our opinion which accompanies this certificate.

"Upon appellee's motion for rehearing, the case of Galbraith-Foxworth Lumber Co. v. Long, 5 S. W., (2d) 163, by the Dallas Court of Civil Appeals, was cited among other cases, and it was urged that the cited case decided all matters of controversy against the contentions of appellant. Appellant, on the other hand, cited the case of Clem v. Forbess, 10 S. W., (2d) 223, application for writ of error dismissed by the Supreme Court, and urged that this case practically determined the issues involved in the instant case favorable to appellant's contentions.

"In addition to the testimony and facts mentioned in our opinion tending to show a joint undertaking or a partnership relation between W. S. Fry and the lumber company, John E. Quarles testified

that he was president of the John E. Quarles Company, and that the company was engaged in buying and selling lumber and building material. That he supposed the reason Fry, the contractor, whose home was in Dallas, came to the John E. Quarles Company was that the company had a young man working for it who formerly worked for the Elliott Lumber Company in Dallas, and Fry had been with Elliott in Dallas. He testified:

" 'The contract price on this job, as I remember, was $8,750. I could not say as to what amount of money was received by me to pay out on this job from Mr. Smith, or other source; I don't know exactly. * * * We knew to whom to pay out that, and how much to pay them, because Fry gave us a list of what he owed on the job. Every dollar that we paid out was on Fry's order, or sometimes he would come with the men and we would pay them there at the yard, would pay them direct. The balance we paid to men whom he told us to pay. * * * The way this job was handled was just the way most of our building contracts are handled, that is, where the contractor is not able to carry his own payroll.

" 'On September 22, 1926, Mr. and Mrs. Smith (who were having the house built) came to my place of business and signed a contract with Fry, whereby the Smiths agreed to pay Fry $8,750, and Fry agreed to construct the improvements on the lot in question. * * * I cannot say as to whether on that day and at the same time Mr. Fry assigned over to me the written contract which he and Smith had signed. * * * I do not know it to be a fact that on the same day that Fry got this contract he executed an instrument whereby he assigned over to the John E. Quarles Company whatever this written assignment says here, but I imagine he did, as that is the only way we would have sold the material. We didn't pay anything for that assignment, nothing whatever. The records will show that the Smiths signed an acceptance of that assignment over to us. * * * When I took this assignment from Mr. Fry I did not advance him anything right then and there; when Mr. Smith made this assignment I was getting his permission to pay $8,750. I was furnishing the building material for that; I was to furnish enough building material to build the house. * * * Under this instrument we should have received the entire consideration of $8,750 on that building from Mr. Smith, but we did not receive it. I have just said that that money was for labor and material, and everything that went into the house. * * * If Mr. Gollnick had not put that plumbing in there the John E. Quarles Company, or Fry,

or somebody for them, would have had to put that plumbing in there, I imagine. * * * It is not a fact that if Mr. Fry, after making that assignment over to us of that money under that contract, and getting material out on the job, had gotten up and left it, we would have had to finish it. It would have been just as much the sub-contractor's business to finish it as it was ours. * * * Q. You know that when a man contracts to build a house, and when it is built it has to be built according to the plans and specifications. This was that kind of a contract, wasn't it? A. I suppose it was.

" 'I don't think that I could have collected for the work on that building when it was half done, under that assignment, nor could I have collected for it when it was three-fourths finished. I don't guess that I could have collected for it when it was all done, all finished, except the plumbing. I suppose that he was liable to us when the building was completely finished. * * *

" 'Q. So that before the John E. Quarles company could get anything under that assignment from Smith they would have to see that the building was completed, just as it was contracted, wouldn't they? A. I don't know as it would be up to us to finish it.

" 'It is a question for the courts to decide as to whether or not before we can collect a dime of that $8,750 we have got to see that the building is completed and delivered to Smith. Somebody would have to finish it, but it would not be our duty to finish it. We were just holding this stuff as collateral. I do not think that after we put the material in it we would have to see that the house was completed before we could get our money. Yes, we were the one to collect that $8,750. No, we did not go ahead and put out the money necessary to complete that building. All the money paid out to anybody was paid out by the Quarles Lumber Company, except what Fry put out himself.'

"Mr. Gollnick testified that he had heard Mr. Quarles testimony about telling him, Gollnick, that Fry had been recommended by the lumber companies in Dallas, and that those statements were made to him after he had finished the job. That he talked to Mr. Horn, who was the bookkeeper of the lumber company, when he had gotten partly through with the job and received one half of the cost of the plumbing according to contract, and asked him whether there would be any 'hitch' in the job. That he had heard something to that effect. That Mr. Horn told him there was nothing so far as he knew. That he wanted to know before he did any more work if there was any question about his getting his pay, and that Mr. Horn

told him that as far as he knew there was not. That after this information Gollnick went ahead and finished the job. That he would not have entered into this contract if Quarles had not told him that he was 'financing the job.' That he took his word for it and did not think it was necessary to go into a contract with him about that. That Quarles had been accustomed to paying his bills for former work he had had done during the preceding several years. That Quarles knew he was doing the plumbing work for this house and did not in any way indicate that there was no money to pay for it until after the work was done. That they led him to believe that there was money to pay him. That Mr. Horn said there was and for him to go right ahead on the job. That on his advice he went ahead with his work. That he went into the office of the lumber company one day and asked for Mr. Quarles and Mr. Horn said he was not in; that he told Mr. Horn: 'I understand that this job is going in the hole over there and will not pay out.' That he further said: 'Fry asked me to go and finish the job, and I would like to know something about it,' and Horn replied: 'As far as I know, the job is in good shape.' That Horn at that time was handling the yard and had just as much to do with the job as Quarles or Lively did. That as a matter of fact he looked to John E. Quarles Company for pay after he entered into the work.

"The evidence shows that on September 22, 1926, Marvin Smith and wife entered into a contract with W. S. Fry, by the terms of which Fry agreed to erect and complete on the described premises one six room brick veneer cottage with breakfast room and bath, porch and double garage. The contractor agreed to furnish all material and labor therefor and deliver such improvements to the owner in a finished condition, free from all liens for material and labor, except as otherwise provided in the contract. The owners agreed to pay to the contractor, when said house was completed, the sum of $8,750, and executed a note, of even date, payable to the contractor, for the full consideration, exclusive of any changes or extras as required by the owners which would increase the cost of the building. The owners agreed to pay to the contractor, or his assigns, the amount of such excess, if any, or that they would execute to him a note or notes for such excess. This provision was included in the building contract, towit:

" 'For the purpose of securing the contractor and his assigns in the payment of all indebtedness which may become due under this contract, including both the original contract price and the reason-

able value, or agreed value, of the extras, additions or alterations heretofore referred to, the owners hereby grant and convey to the contractor and his assigns an express contractor's, mechanic's, and materialman's lien upon the land and premises above described, and all improvements thereon situated or which may be hereafter placed thereon.

" 'The failure of the contractor to comply with the terms hereof shall not defeat such indebtedness nor said liens, but such liens and said indebtedness shall in that event continue in favor of the contractor and his assigns, less such amount as may be reasonably necessary to complete said improvements in accordance with this contract.'

"This contract was duly executed by Mr. and Mrs. Smith and W. S. Fry.

"At the same time and place the building contract was executed, towit, at the office of John E. Quarles Company, there was executed a transfer of the mechanic's lien and deed of trust by W. S. Fry to the John E. Quarles Company, together with a note given by the Smiths to Fry. This transfer contained these two paragraphs:

" 'And whereas, said lien and deed of trust were granted for the purpose of securing the contract price of certain improvements to be erected on the premises aforesaid, and any additions thereto caused by alterations or additions; and whereas, it is the desire of such contractor to fulfill said contract but to assign to the transferee hereinafter named all notes and evidences of debt which he holds or to which he may become entitled during the performance by him of said contract;

" 'Now, therefore, for a valuable consideration paid, receipt of which is acknowledged, I, W. S. Fry, contractor as aforesaid, do transfer and assign unto John E. Quarles Company, all indebtedness and evidences thereof, owing or to accrue in my favor, under the lien and deed of trust aforesaid, including any note or notes taken for additions to the contract price, and do convey unto said John E. Quarles Company, said lien and deed of trust and all right, title and interest owned by me in and to the premises aforesaid.'

"This assignment was duly executed by W. S. Fry. Gollnick, employed by Fry, agreed to do the plumbing in said house for $916. By the terms of the contract, 50% of the total consideration was to be paid when half of the work was done and the balance when the work was completed. Gollnick testified that at the time he entered

into the contract, at the office of the Quarles Company, Mr. Quarles was present.

"The cost of completing the house exceeded the contract price of $8,750, by about $2500. The sub-contractors and Mr. Fry and the president of the John E. Quarles Company met to determine what was best to be done, and all of the sub-contractors, except Gollnick, and the lumber company agreed to accept pro rata payment of the balance due them, which the witnesses say amount to 74% of the contract price of the various sub-contractors and the John E. Quarles Company, which had furnished the major portion of the material, including lumber, brick, sand, etc. Gollnick would not accept the settlement and brought suit against Fry and the John E. Quarles Company, for $458, with interest and $20 attorney's fees. He alleged that the John E. Quarles Company paid Fry no consideration for the assignment to it of the note and the mechanic's lien, which is admitted by Quarles, and that by the terms of the agreement between Fry and the John E. Quarles Company, the consideration owing by the owners of the property was to be paid to the company, and that the company should pay the workmen and pay the sub-contractors for their work and labor.

"Plaintiff below submitted three specially requested instructions, in addition to the motion for an instructed verdict, as follows:

" 'Gentlemen of the Jury:

" 'You are instructed that a contract may be express or implied. A contract is said to be implied when there is no express agreement of the parties, but such agreement may be implied from all the facts and circumstances in the case and the dealings of the parties with respect thereto. An implied contract arises where there are circumstances, which according to the ordinary course of dealing and the common understanding of men show a mutual intent to make such contract.

" 'Bearing this definition in mind, you will answer the following question:

" 'Question: Did the defendant John E. Quarles impliedly agree to pay the plaintiff for the plumbing work done by him upon the building in question in accordance with the bid submitted by him?

" 'Answer: Yes or no.

" 'You are instructed that with respect to a particular transaction a partnership is where two or more persons place their money, property, labor and skill or some of them, into the particular undertaking and with the understanding that the profits therefrom

will be divided according to such proportions as the parties may agree upon.

" 'Bearing this definition in mind, you will answer this question:

" 'Question: Were the defendants John E. Quarles Company and W. S. Fry partners in the undertaking to build and construct the improvements under the Smith contract?

" 'Answer: Yes or No.

" 'Question: Was the defendant W. S. Fry acting on behalf or as the agent of John E. Quarles Company in accepting the bid by the plaintiff for the plumbing work under the Smith contract?

" 'Answer: Yes or No.'

"It was urged by plaintiff in the court below, and by appellant here, that the testimony and pleadings would at least sustain a finding favorable to appellant upon the three issues requested and refused. That the lumber company received from Marvin Smith and wife the full consideration for the construction of the building; that $7,000 was paid to the lumber company out of the loan obtained from a loan company, and $1750 was paid to said lumber company, or its order, by the said Smith, and that Smith and the loan company, before making the final payment, required that $550 thereof be deposited in the bank to await the outcome of this suit, 'and to secure plaintiff and the said Smith upon plaintiff's work and protect the said Smith against plaintiff's claim for a lien upon said premises.'

"On motion for rehearing, the members of this court are not entirely agreed as to what disposition should be made of it, and think it advisable to certify to Your Honors the following questions:

"1. Under the pleadings and the facts as stated in this certificate, did the trial court err as a matter of law in giving the peremptory instruction for the John E. Quarles Company?

"2. Did the trial court err in refusing to submit the three special issues tendered by plaintiff below, and included in this certificate, or issues involving the same or similar questions?"

In our opinion the action of the trial court in giving a peremptory instruction for the John E. Quarles Company was correct. Galbraith-Foxworth Lumber Co. v. Long, 5 S. W., (2d) 163; C. J., Vol. 5, p. 977, Sec. 169, and authorities there cited.

The assignment made by Fry, the contractor, to the Quarles Lumber Company did not cover the entire contract. If it had been attempted, with the consent of the owner, for a valuable consideration, to substitute the lumber company for the contractor, such

company would thereby have assumed and obligated itself to fully perform the contract according to its terms. C. J., Vol. 5, p. 977.

The transaction shown by the record in this case merely amounted to an assignment by the contractor of the amount due him under the contract, together with the lien securing same, as collateral to secure the lumber company for materials furnished and money advanced to pay the labor bills of the contractor. The express stipulation in the assignment, "that it is the desire of the contractor to fulfill said contract," together with the undisputed facts showing that he did in fact construct the building as he had reserved the right to do by the terms of the assignment, negatives any assumption of such duty by the lumber company, either express or implied.

The well established rule that where one accepts the benefits of a contract he must assume its burdens is invoked by appellant to sustain the proposition that he was entitled to recover the full amount due for the plumbing work done by him, and Kirby Lumber Co. v. R. L. Lumber Co., 279 S. W., 546, is cited as being directly in point to sustain this proposition. The case relied on is clearly distinguishable from the present case, in that, the assignment there made covered not merely the money to become due under the contract, but the entire contract, and it was further shown that the assignee entered upon the performance of the obligations imposed by the contract. Here the contractor reserved the right to, and did in fact, perform the contract, the lumber company merely furnishing the materials and paying orders given by the contractor for labor performed in carrying out the contract. It is not shown that there was any agreement, either express or implied, that the lumber company was to receive any benefit from the contract other than the usual profit it made upon the material furnished, which it would have received independently of any assignment. For the same reason, we think the issue of partnership between the lumber company and the contractor in the construction of the improvements for the owner was not raised by the evidence. The record is wholly devoid of any evidence showing that the lumber company was to receive any part of the profits made by the contractor in carrying out his contract with the owner of the property.

But one other contention need be noticed, and that is the claim that the lumber company should be held responsible for the full amount owing to appellant Gollnick, because its representative informed him that the lumber company was "financing this job" and that he was induced thereby to carry out his agreement with the

contractor to install the plumbing. We think the statement that the lumber company was financing the job cannot fairly be construed as an unconditional promise upon its part to pay Gollnick for the work done by him, but rather as indicating that the lumber company was financing the job to the extent of the contract price. That Gollnick so understood the representation is indicated by his own testimony that "when he (Quarles) said he was financing the job, I just expected him to pay for that up to the price of the contract."

It follows from what has been said that the first question certified should be answered in the negative, which renders it unnecessary that we answer the remaining question.

The opinion of the Commission of Appeals answering the certified questions is adopted and ordered certified.

*C. M. Cureton,* Chief Justice.